UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BELL SEMICONDUCTOR, LLC,

      Plaintiff,

– against –

BROADCOM CORPORATION *and*
AVAGO TECHNOLOGIES
INTERNATIONAL SALES PTE,
LIMITED,

      Defendants.

**OPINION & ORDER**

24-cv-156 (ER)

Ramos, D.J.:

  Bell Semiconductor, LLC ("Bell") brings this action against Broadcom Corporation ("Broadcom") and Avago Technologies International Sales PTE ("Avago") (collectively, "Defendants"), alleging breach of a patent assignment agreement between the parties. Doc. 32 at 1. Before the Court is Defendants' motion to dismiss the amended complaint. Doc. 36. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

  The following facts are taken from the Complaint unless otherwise noted.

### A. The Agreement

  On November 30, 2017, a patent assignment agreement ("Agreement") was executed between assignees Bell, Hilco Patent Acquisition 56 LLC ("Hilco"), and Bell Northern Research LLC ("Bell Northern") (collectively, "Assignees"); and Defendants.[1] Doc. 32 ¶¶ 1–2 (Amended Complaint). Pursuant to the Agreement, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *Id.* ¶ 2.

---

[1] Although Avago is not a party to the Agreement, its predecessor-in-interest, Avago Technologies General IP (Singapore) Pte. Ltd. ("Avago IP"), is a named assignor to the Agreement, along with Broadcom.

Under the terms of the Agreement, █████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████ *Id.* ¶ 6. ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████

Exhibit C to the Agreement ████████████████████████
████████████████████████████████████████████████████
██████████████████████████ *Id.* ███████████████████
████████████████████████████████████████ which had previously been acquired by Texas Instruments, *id.* ¶ 38, ████████████████ *See* Doc. 32-1.

████████████████████████████████████████████████████
████████████████████████████████████████████████████





**B. Broadcom's Alleged Failure to Disclose the National Semiconductor License**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Doc. 32 ¶¶ 33–34. On September 23, 2011, National Semiconductor was acquired by Texas Instruments. *Id.* ¶ 38. Likewise, on May 6, 2014, LSI was acquired by Avago IP, Defendant Avago's predecessor-in interest. *Id.* ¶¶ 1, 35. On November 30, 2017, the Agreement at issue in the instant case was executed. *Id.* ¶¶ 1.

On February 21, 2020, three years after the November 30, 2017 Agreement was executed, Bell filed a patent infringement lawsuit against Texas Instruments.[3] *Id.* ¶ 45.

---

[2] LSI Corporation was acquired by Avago Technologies, Defendants' predecessor-in-interest, on May 6, 2014. Doc. 32 ¶ 35.

[3] *Bell Semiconductor, LLC v. Texas Instruments Inc.*, Docket No. 20 Civ. 00048 (E.D. Tex.).

At some point after this litigation commenced, Texas Instruments raised the National Semiconductor License as a partial defense to Bell's allegations.[4]  *Id.* ¶ 46.  Also, in February 2021, Texas Instruments completed an internal reorganization that brought multiple Texas Instruments manufacturing, assembly-test, and sales entities within the scope of the National Semiconductor License.  The consolidation thereby limited future patent infringement liability against Texas Instruments on the Patents.  *Id.* ¶ 50.  One month later, on March 16, 2021, Bell settled its litigation with Texas Instruments, as well as several other associated petitions for *inter partes review*.  *Id.* ¶ 51.  The settlement was unfavorable to Bell in that Bell did not receive any financial consideration under the settlement agreement.  *See id.* ¶ 52.

According to Bell, the availability and potential recovery from patent infringement lawsuits against Texas Instruments was a significant factor in its decision to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.* ¶¶ 29, 31–32.  Had Bell known that Texas Instruments was partially insulated from patent infringement suits by the National Semiconductor License, it "would have bargained for and paid a lower price" for the patent assignment Agreement.  *Id.* ¶ 59.  Therefore, according to Bell, it was directly damaged by Defendants' nondisclosure and breach of warranty, "because the market value of the patent portfolio [it] acquired was not commensurate with the value of the portfolio as represented and warranted in the [Agreement]."  *Id.*  Such a breach allegedly deprived Bell of the benefit of its bargain with Defendants.  *Id.* ¶ 92.

---

[4] The complaint does not specify the date Texas Instruments raised the National Semiconductor License as a partial defense to Bell's allegations, *see* Doc. 32 ¶ 46; however, it does state that Bell first became aware of the National Semiconductor License when the now-former CEO of Bell, John Veschi, was shown the National Semiconductor License during a during a deposition on February 12, 2021.  *Id.* ¶¶ 47–48.  Presumably, Texas Instruments raised the National Semiconductor License as a defense after the February 12, 2021 deposition.

### C. Broadcom's Alleged Failure to Provide Bell Reasonable Assistance in Litigation

On October 13, 2022, Bell filed a complaint against fifteen third parties with the International Trade Commission ("ITC") in ITC Investigation No. 337-TA-1342. *Id.* ¶ 62. A week after filing, Bell promptly applied for the issuance of a subpoena to Broadcom. *Id.* ¶¶ 63–64. Bell needed the subpoenaed materials from Broadcom in order to meet the "domestic industry requirement" under 19 U.S.C. § 1337(a)(2)–3.[5] *See id.* ¶¶ 8, 62–63, 69. The subpoena was issued and served on Broadcom on December 6, 2022. *Id.* ¶¶ 64–65. A month later, on January 9, 2023, Broadcom responded, and Bell and Broadcom thereafter engaged in ongoing communications related to the requested materials. *Id.* ¶ 66. Initially, Broadcom objected to Bell's requests because they were burdensome. *Id.* ¶ 67. In response, on February 24, 2023, Bell narrowed its request to a discrete parts list. *Id.* ¶ 68.

Throughout discovery, Bell's counsel regularly communicated with Broadcom's counsel to investigate the status of the requested materials. *Id.* ¶ 73. Additionally, Bell repeatedly offered to assist Broadcom with production, including volunteering its own experts to interface with Broadcom and assist it with any technical issues. *Id.* ¶¶ 73–74. On one occasion, Broadcom did accept Bell's offer, and Bell helped Broadcom to identify some of the requested materials. *Id.* ¶ 74.

Broadcom was aware of Bell's discovery deadlines. *Id.* ¶ 78. However, on April 27, 2023, days before the close of fact discovery in Investigation No. 337-TA-1342,[6] Broadcom's counsel phoned Bell's counsel and explained that Broadcom required an additional 45 days to produce the remaining responsive materials. *Id.* ¶ 75. The third parties in ITC Investigation No. 337-TA-1342 were unwilling to agree to an extension,

---

[5] The domestic industry requirement mandates that a complainant asserting patent infringement in a Section 337 investigation at the ITC must show that either the complainant or the complainant's licensee has made certain significant investments in the United States. *See* 19 U.S.C. § 1337(a)(2)–(3).

[6] The Amended Complaint does not include the exact date that discovery closed. *See* Doc. 32 at 15–16.

6

and the materials that had already been produced were insufficient to allow Bell to meet the domestic industry requirement. *Id.* ¶¶ 77–78, 82. As a result, Bell was forced to dismiss both ITC Investigations. *Id.* ¶ 82. According to Bell, ███████████

███████████████████████████████████████

███████████████████████████████████████

███. *See id.* ¶ 8. According to Bell, had it been able to meet the domestic industry requirement, it would have been able to achieve "appropriate" settlements—as commensurate with the value of Bell's patents—with the parties in the ITC Investigations and other entities. *Id.* ¶ 84. Bell also agreed to lower settlements in subsequent litigations with other parties, ███████████████████████████████

███████████████████████████████████████

███████████████████ *Id.* ¶¶ 8, 84.

### D. PROCEDURAL HISTORY

Bell first filed this action in New York Supreme Court, New York County, on November 29, 2023, alleging two breaches of the patent assignment Agreement.[7] Doc. 1. On January 9, 2024, Defendants removed the case to this Court. *Id.* On April 19, 2024, Bell filed its first amended complaint. Doc. 32 ("Amended Complaint"). Defendants thereafter filed this motion to dismiss the Amended Complaint in its entirety on May 9, 2024. Doc. 36.

## II.   LEGAL STANDARD

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

---

[7] *Bell Semiconductor, LLC v. Broadcom Corporation et al.*, Index No. 655950/2023 (N.Y. Sup. Ct. 2023).

The purpose of Rule 12(b)(6) "is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (citation omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). To state a plausible claim, the plaintiff "must 'raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" *Citizens United v. Schneiderman*, 882 F.3d 374, 380 (2d Cir. 2018) (quoting *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### III.  DISCUSSION

Bell alleges two separate counts for breach of contract: (1) Defendants' failure to disclose an encumbrance—the National Semiconductor License—on the Patents, and (2) Defendants' failure to provide reasonable assistance in ITC Investigations Nos. 337-TA-1340 and -1342 (together, "ITC Investigations"). Doc. 32 ¶¶ 86–96. For each breach, Bell seeks to recover direct damages that it sustained because Defendants deprived Bell of the full benefit of its bargain. *Id.* ¶¶ 92, 96.

Defendants have moved to dismiss both counts. Doc. 36. As to Count 1 only, Defendants argue that Bell has not stated a claim of breach of Section 5.1(i) of the agreement and Bell has failed to allege either intentional misrepresentation or fraud.

Doc. 40 at 13, 16. Additionally, Defendants argue that Bell has not adequately alleged damages under either Count 1 or Count 2. *Id.* at 17.

### A. Bell Has Failed to Allege a Breach of Section 5.1 of the Agreement

First, Defendants move to dismiss Count 1 for failure to state a claim of breach of Section 5.1(i) of the Agreement, arguing that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Doc. 40 at 5. Bell disagrees, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Doc. 51 at 16–17 (emphasis added).

"The interpretation of a contract is a matter of law for the court." *1550 Fifth Avenue Bay Shore, LLC v. 1550 Fifth Avenue, LLC*, 297 A.D.2d 781, 783 (N.Y. App. Div. 2002). Under New York law,[8] "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (N.Y. 2002) (citation omitted). When interpreting a contract, a "[c]ourt must look first to the parties' written agreement to determine the parties' intent and limit its inquiry to the words of the agreement itself if the agreement sets forth the parties' intent clearly and unambiguously." *Sterling Drug, Inc. v. Bayer AG*, 792 F. Supp. 1357, 1365–66 (S.D.N.Y. 1992) (citing *Nicholas Laboratories Ltd. v. Almay, Inc.*, 900 F.2d 19, 20–21 (2d Cir. 1990)). If the language of the contract is "unambiguous" with respect to the provision at issue, dismissal is appropriate. *See MS Federal Acquisition, LLC v. U.S. Bank National Association*, Docket No. 14 Civ. 7794 (LTS), 2015 U.S. Dist. LEXIS 95152, at *7–8 (S.D.N.Y. July 21, 2015).

---

[8] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Doc. 32-1. Moreover, neither party argues that New York law is inapplicable in this case.

However, "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless each is a reasonable interpretation." *Bank v. Verde Energy USA Inc.*, 2021 U.S. App. LEXIS 27086, at *3 (2d Cir. Sept. 9, 2021) (quoting *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotation marks omitted)). Nor does ambiguity exist if the contract language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Hunt, Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting *Breed v. Insurance Company of North America*, 46 N.Y.2d 351, 355 (N.Y. 1978) (internal quotation marks omitted) (alteration in original)).

Under § 5.1(i) of the Agreement, ███████████████████████████████████████████████ Doc. 32-1 (emphasis added). Bell argues that "with respect to" is a phrase that "encompass[es] a broader set of loose relationships of one thing relating to, pertaining to, or having to do with another" and "reflect[s] a belt-and-suspenders approach . . . to ensure that ███████████████████████████ Doc. 51 at 15–17 (discerning the meaning of "with respect to" by reference to numerous dictionaries). However, while dictionary definitions can serve as "as an aid in determining a word's reasonable and ordinary meaning[,]" *Hartford Fire Insurance Co. v. Novocargo USA Inc.*, 257 F. Supp. 2d 665, 675 (S.D.N.Y. 2003), when parties to a contract dispute the meaning of a particular clause, as here, a court must "determine whether such clauses are ambiguous when 'read in the context of the entire agreement.'" *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) (quoting *W.W.W. Associates v. Giancontieri*, 77 N.Y.2d 157, 163 (N.Y. 1990)). "[W]here consideration of the contract as a whole will

10

remove the ambiguity created by a particular clause, there is no ambiguity." *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 300 (2d Cir. 1996).

Defendants aptly point out that the Agreement expressly defines "Affiliates" and then uses that term throughout the Agreement ███████████████████████ ███████ Doc. 40 at 14 (citing Doc. 32-1 §§ 3.3, 3.4, 8.1(h), 9.1). Furthermore, ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████ *Id.* Defendants argue that such an omission is telling because "the parties would have been explicit if they wanted to include affiliates of the [Exhibit C] entities." *Id.* The Court agrees. Under New York law, "[i]t is well settled that a contract must be read as a whole to give effect and meaning to every term. Indeed, [a] contract should be interpreted in a way [that] reconciles all [of] its provisions, if possible." *New York State Thruway Authority v. KTA-Tator Engineering Services, P.C.*, 913 N.Y.S.2d 438, 440 (N.Y. App. Div. 2010) (internal quotation marks and citations omitted) (second, third, and fourth alteration in original); *see also Beal Savings Bank v. Sommer*, 8 N.Y.3d 318, 324 (N.Y. 2007) ("A reading of [a] contract should not render any portion meaningless.") (citations omitted). Here, the Agreement provides a definition for the term "Affiliates," Doc. 32-1 § 2.1, and the term is used in many provisions of the Agreement. *See, e.g.,* Doc. 32-1 §§ 3.3, 3.4, 8.1(h), 9.1. However, ██████████████████████████████████████████████ *Id*. Accordingly, the Court cannot expand the definition the parties agreed to in the Agreement. To do so would render the Agreement's use of the term "Affiliates" superfluous.

Furthermore, "the objective of contract interpretation is to give effect to the *expressed* intentions of the parties." *Hunt*, 889 F.2d at 1277 (emphasis added). It follows that "if parties to a contract omit terms[,] . . . the inescapable conclusion is that the parties intended the omission." *CH Acquisitions 2, LLC v. Aquila Aviation A.P.*, Docket No. 16

Civ. 2030 (RJS), 2018 U.S. Dist. LEXIS 68931, at *33 (S.D.N.Y. Mar. 30, 2018) (quoting *Quadrant Structured Products Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (N.Y. 2014) (internal quotation marks omitted) (alteration in original)). Bell provides no evidence that would allow the Court to infer that the parties did not intend to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ nor does it cite to any legal authority to support such a reading. Thus, the language of § 5.1(i) is not ambiguous in the context of the entire agreement. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ Therefore, dismissal of Count 1 is appropriate.

### B. Bell Does Not Allege Intentional Misrepresentation or Fraud

Defendants also argue that Bell has not pled intentional misrepresentation or fraud with sufficient particularity, as required by Rule 9(b). Doc. 40 at 16. In reply, Bell points out that intentional misrepresentation is not an essential element for Count 1 but nevertheless argues that the Amended Complaint satisfies the heightened Rule 9(b) standard. Doc. 51 at 18.

Bell is correct that Count 1 does not include a claim for intentional misrepresentation or fraud. Count 1 is premised on Defendants' breach of the Agreement. Doc. 32 ¶¶ 86–92. "When a party is in essence seeking the enforcement of a contractual bargain, the claim is to be premised upon a breach of contract theory rather than a tort claim." *Giuliano v. Barch*, Docket No. 16 Civ. 0859 (NSR), 2017 U.S. Dist. LEXIS 50396, at *28 (S.D.N.Y. Mar. 31, 2017) (citing *Sommer v. Federal Signal*, 583 N.Y.S.2d 957, 961 (N.Y. 1992)). A claim for fraud and misrepresentation is based in tort, not in contract. Furthermore, it is well settled under New York law that "a cause of action sounding in fraud is not viable when the only fraud charged relates to a breach of contract." *Id.* at *28 (citing *Trusthouse Forte (Garden City) Management, Inc. v. Garden City Hotel Inc.*, 483 N.Y.S.2d 216, 218 (N.Y. App. Div. 1984)).

Thus, Rule 9(b) does not apply to Bell's claims for breach of contract. There is therefore no need for the Court to determine whether Bell has satisfied the heightened pleading requirements of Rule 9(b). In any event, as discussed above, Bell failed to allege a breach of § 5.1 and Count 1 is dismissed.

### C. Bell Sufficiently Alleges that Damages for Failure to Render Reasonable Assistance in Litigation Are Recoverable Under the Agreement

Finally, Defendants move to dismiss Bell's claims pursuant to the Agreement's █████████████████████████████████████████████████████████████.[9] Doc. 40 at 17–18. They argue that, although the complaint seeks benefit-of-the-bargain damages, Bell has merely "dress[ed] up a claim for consequential damages" because the "only lost value under the alleged breach is [Bell's] access to a larger pool of litigation targets and settlement proceeds, a value . . . measured by reference to unrecoverable lost profits." *Id.* at 18–19. Because the complaint does not actually allege any direct damages, Defendants argue, it must be dismissed. *Id.* at 20.

For Bell to prevail on its breach of contract claims, it must prove "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the breach." *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (quoting *RCN Telecom Services, Inc. v. 202 Centre Street Realty LLC*, 156 Fed. Appx. 349, 350–51 (2d Cir. 2005) (internal quotation marks omitted). Damages for breach of contract are generally divided into two types: "general (or direct) damages, which compensate for the value of the promised performance, and consequential damages, which are indirect and compensate for additional losses incurred as a result of the breach[.]" *Appliance Giant, Inc. v. Columbia 90 Associates, LLC*, 8 A.D.3d 932, 934 (N.Y. App. Div. 2004). New York law mandates a "case-specific approach . . . to distinguish general damages from consequential damages."

---

[9] Defendants also move to dismiss Count 1 on this basis. Doc. 40 at 17–18. Because the Court is granting Defendants' motion to dismiss Count 1 on other grounds, it does not reach this argument.

*Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 808 (N.Y. 2014) (citation omitted).

Consequential damages are "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act." DAMAGES, Black's Law Dictionary (10th ed. 2014). ███████████████████████████████████ ██████████ Conversely, 'benefit-of-the-bargain' damages generally do not fall under consequential damages. *See In re CCT Communications, Inc.*, 464 B.R. 97, 118 (Bankr. S.D.N.Y. 2011) (finding that ordinary benefit of the bargain market damages are recoverable as general damages*)*; *Latham Land I, LLC v. TGI Friday's, Inc.*, 96 A.D.3d 1327, 1331 (N.Y. App. Div. 2012) (finding that the damages sought by plaintiff to recover "the loss of the benefit of the bargain" were not barred by a contractual provision excluding consequential damages). Benefit-of-the-bargain damages are designed to place the non-breaching party in the same position they would have been had the contract been fully performed. *Latham Land* at 1331.

"New York courts have routinely enforced liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed." *Process America, Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016). Here, the relevant Agreement provision ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Neither party argues—and the Court does not find—that the provision is ambiguous, nor does Bell dispute Defendants' interpretation of the scope of ████████████████████████████. Instead, Bell argues that it seeks *direct* damages because it aims "to recover the value of bargained-for services, including legal assistance, that were not provided[.]" Doc. 51 at 11–12. The question, therefore, is whether the damages sought by Bell constitute direct or consequential damages.

14

Bell alleges that it was deprived of ███████████████ in the ITC Investigations which Broadcom agreed to provide under the Agreement and was therefore forced to make lower settlement agreements with the third parties. Doc. 32 ¶¶ 83–85. According to Bell, had it "known that Broadcom would not provide the bargained-for reasonable assistance in litigation, [it] would not have agreed to pay as much as it did for the [] Patents." *Id.* ¶ 85. It also argues that it would be premature to dismiss its claims without fact and expert discovery,[10] citing *American Electric Co. v. Westinghouse Electric Corp.*, 418 F. Supp. 435, 459 (S.D.N.Y. 1976), and *Bankers Conseco Life Insurance Co. v. Wilmington Trust, National Association*, 195 A.D.3d 109, 115 (N.Y. App. Div. 2021). Doc. 51 at 10–11.

"[T]here is no standard test for determining what are direct damages and what are not, and each case must be analyzed in accordance with its particular facts." *Bankers Conseco*, 195 A.D.3d at 115 (internal quotation marks omitted). However, while "the precise demarcation between direct and consequential damages is a question of fact," *American Electric Co.*, 418 F. Supp. at 459, dismissal can be appropriate where recovery of consequential damages is prohibited by the contract and the alleged damages are clearly consequential in nature. *See, e.g., DirecTV Latin America, LLC v. RCTV International Corp.*, 115 A.D.3d 539 (N.Y. App. Div. 2014), *aff'g* Docket No. 651824/2011, 2013 WL 203397 (N.Y. Sup. Ct. 2013); *see also Bankers Conseco*, 195 A.D.3d at 115–16 (citing *DirecTV* as the "classic example of consequential damages.").

---

[10] Bell also cites this Court's opinion in *EMR (USA Holdings) Inc. v. Goldberg*, claiming that "[i]n assessing pleadings . . . [this Court] was 'not convinced' by arguments characterizing [benefit-of-the-bargain] claims as seeking consequential damages[.]" Doc. 51 at 11 (quoting *EMR (USA Holdings) Inc. v. Goldberg,* Docket No. 16 Civ. 7849 (ER), at *27–28 (S.D.N.Y. Nov. 26, 2019)). However, the specific argument raised by the *EMR* defendants is not the same argument advanced by Defendants here. In *EMR*, the defendants argued that *all* 'benefit-of-the-bargain' damages constitute consequential damages. See Memorandum of Law in Opposition to Motion, *EMR (USA Holdings) Inc. v. Goldberg,* Docket No. 16 Civ. 7849 (ER) (S.D.N.Y. Nov. 26, 2019), ECF No. 132, at 11–12. Here, Defendants do not dispute that 'benefit-of-the-bargain' damages generally constitute direct damages. They instead argue that labelling damages as 'benefit-of-the-bargain' damages "does not automatically transform a claim of consequential damages into one for direct damages." Doc. 56 at 9.

For example, in *DirecTV*, where the contract between the parties expressly prohibited recovery for consequential damages, the court found that the plaintiff's characterization of its damages as the loss of the "general market value of having a television channel reach a [larger] viewing audience . . . measured by reference to unrecoverable lost profits" did not transform such consequential damages into a recoverable claim. *DirecTV*, 115 A.D.3d at 541 (internal quotation marks omitted) (alterations in original). Accordingly, the court found dismissal appropriate. *See id.*

Defendants cite to the plaintiff's argument in *DirecTV* as an analogous "trojan horse argument[,]" insisting that the "only . . . lost value that Bell identified in the FAC [is] . . . the 'lower settlement figures' from unsuccessfully suing fifteen respondents at the ITC[.]" *Id.* at 11 (citing *DirecTV*, 115 A.D.3d at 539–40). Bell disputes this characterization, citing the Second Circuit's decision in *Moreno-Godoy v. Kartagener* for the principle that "under New York law, a party deprived of bargained-for legal assistance is entitled to pursue a claim for damages to recover the value of those legal services." Doc. 51 at 10 (citing *Moreno-Godoy*, 7 F.4th at 86). Bell further argues that such recovery is available, under *Moreno-Godoy*, in the form of expectation damages even if Defendants' assistance would not have changed the outcome in the ITC Investigations. *See id.* at 10 (citing *Moreno-Godoy* at 85–86). Bell emphasizes that the Amended Complaint does not seek to recover losses incurred in third-party litigations but to "recover the value of bargained-for services . . . that were not provided" which "plainly constitute direct damages." *Id.* at 11–12.

Defendants do not make any specific arguments addressing the recoverability of bargained-for legal assistance. Regardless, the result in *DirecTV* is not dispositive here. In *DirecTV*, the plaintiff did not seek "the value of the task itself" but lost advertising revenue related to third party agreements. *Bankers Conseco*, 195 A.D.3d at 116 (analyzing *DirecTV* in the context of recoverable damages). Therefore, "it was . . . clear that there was no inherent value . . . that was not ultimately tied to lost profits[.]" *Id.* at

16

115–16 (same). In fact, the transaction in *DirectTV* did not involve monetary consideration at all. *DirecTV*, 2013 WL 203397, at *2 ("The sole consideration for the contract was the services exchanged, i.e., RCTV transmitted its programming to [DirecTV] solely in exchange for [DirecTV] distributing the programming through its network."). Dismissal was therefore appropriate.

Here, however, Bell paid ▇▇▇▇ for the Patents pursuant to an agreement which expressly required Broadcom to ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The Court can reasonably infer from the Amended Complaint that Bell merely seeks to be compensated for the value of ▇▇▇▇▇▇▇▇▇▇▇ that Broadcom promised to deliver under the Agreement. *See* Doc. 32 ¶¶ 83–85.

Defendants also argue that "Bell did not plead any facts in the FAC that show the difference between the amount that Bell paid for the [P]atents and the speculative value of the [P]atents today" and that such a failure suggests "that Bell is really asking for speculative consequential damages that flow from collateral business dealings unrelated to the Assignment." Doc. 56 at 13. However, Bell is not required to calculate damages at the pleadings stage. *Harry v. Total Gas & Power North America, Inc.*, 889 F.3d 104, 115 (2d Cir. 2018); *see also Luitpold Pharmaceuticals, Inc. v. ED. Geistlich Söhne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (finding a speculative measure of damages in a breach of contract action does not justify dismissal under Rule 12(b)(6)). To sufficiently plead damages, a plaintiff need only "allege facts from which damages can be properly inferred." *Spencer Trask Software and Information Services, LLC. V. Rpost International, Ltd.*, 383 F. Supp. 2d 428 (S.D.N.Y. 2003) (citing *Black v. Chittenden*, 69 N.Y.2d 665, 668 (N.Y. 1983); *A.S. Rampell Inc. v. Hyster Co.*, 3 N.Y.2d 369, 383 (N.Y. 1957)). Here, Bell must allege facts from which direct damages can be properly inferred, but it does not need to prove that its damages are readily calculable at this stage.

17

Finally, Defendants cite *Biotronik v. Conor Medystems* to argue that Bell's damages are consequential because "the alleged promise in question was not the 'very essence of the contract.'" Doc. 56 at 12–13 (quoting *Biotronik*, 22 N.Y.3d at 808). However, Defendants argue for a stricter pleading standard than *Biotronik* imposes. The *Biotronik* court did not require that the breach must strike at the "essence" of the contract. As that court made clear, determining whether direct damages are available for breach of contract turns on "whether the nature of the agreement support[s] a conclusion that [the damages] flowed directly from the breach." *Biotronik*, 22 N.Y.3d at 806. Furthermore, *Biotronik* involved a claim for lost profits. *Id.* at 804. While Defendants attempt to portray Bell's damages as lost profits, Bell does not make a claim for lost profits. It seeks compensation for the assistance in litigation that it bargained and paid for under the Agreement. *See* Doc. 32 ¶¶ 93–96. The value of such assistance may be recovered as damages because they "flow[] directly from the breach." *Biotronik*, 22 N.Y.3d at 806.

Accordingly, Bell has sufficiently alleged damages which are recoverable under the Agreement. Such alleged losses are not consequential damages; they are general damages measured "by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract." *Latham Land I*, 96 A.D.3d at 1331. If Bell is successful in proving Broadcom's breach, it would be entitled to seek damages for the value of the reasonable legal assistance Broadcom agreed to provide. *See Moreno-Godoy*, 7 F.4th at 86. This is true even if Bell would have always settled the ITC Investigations. *Id*. Therefore, dismissal of Bell's claims for damages with respect to Defendants' alleged failure to render reasonable assistance in the ITC Investigations would be inappropriate at this stage of litigation.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. The clerk of Court is respectfully directed to terminate the motion,

Doc. 36. The parties are directed to appear for a telephonic status conference at 11:30 a.m. on January 10, 2025. The parties are directed to dial (855) 244-8681 and enter access code 2301 087 7354 when prompted.

It is SO ORDERED.

Dated:   December 9, 2024
         New York, New York

                                                    _____
                                                    EDGARDO RAMOS, U.S.D.J.